**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | * | |
| **PG&E NATIONAL ENERGY GROUP, INC.,** | * | Case No.: 03-30459 (PM) |
| **Debtor.** | * | (Chapter 11) |
| Tax I.D. No. 94-3316236 | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

| | | |
|---|---|---|
| In re: | * | |
| **PG&E ENERGY TRADING HOLDINGS CORP.,** | * | Case No.: 03-30463 (PM) |
| **Debtor.** | * | (Chapter 11) |
| Tax I.D. No. 94-3147463 | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

| | | |
|---|---|---|
| In re: | * | |
| **PG&E ENERGY TRADING - GAS CORP.,** | * | Case No.: 03-30464 (PM) |
| **Debtor.** | * | (Chapter 11) |
| Tax I.D. No. 94-3115649 | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

| | | |
|---|---|---|
| In re: | * | |
| **PG&E ET INVESTMENTS CORP.,** | * | Case No.: 03-30462 (PM) |
| **Debtor.** | * | (Chapter 11) |
| Tax I.D. No. 74-2885086 | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

In re:                                    *

**PG&E ENERGY TRADING - POWER,**          *        Case No.: 03-30461 (PM)
**L.P.,**                                            (Chapter 11)
      **Debtor.**                     *

Tax I.D. No. 52-1923766                   *

\*    \*    \*    \*    \*    \*     \*    \*    \*    \*    \*    \*    \*

### DEBTORS' MOTION FOR AUTHORITY FOR CERTAIN DEBTORS TO FILE (i) A CONSOLIDATED LIST OF CREDITORS; AND (ii) A CONSOLIDATED LIST OF THE 30 LARGEST CREDITORS IN LIEU OF THE INDIVIDUAL LISTS <u>REQUIRED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 1007(d)</u>

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[1], by and through their undersigned attorneys, file this Motion for Authority for Certain Debtors to File (i) a Consolidated List of Creditors; and (ii) a Consolidated List of the 30 Largest Creditors in Lieu of the Individual Lists Required by Federal Rule of Bankruptcy Procedure 1007(d) (the "Motion"), and in support thereof state:

### <u>Jurisdiction and Venue</u>

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157.

2.     The relief sought in this Motion is based upon section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et. seq.</u> (the "Bankruptcy Code") and

---

[1]    The Debtors are PG&E National Energy Group, Inc. ("NEG"), PG&E Energy Trading Holdings Corporation ("ET Holdings"), PG&E Energy Trading - Gas Corporation ("ET Gas"), PG&E ET Investments Corporation ("ET Inv."), and PG&E Energy Trading - Power, L.P. ("ET Power," together with ET Holdings, ET Gas and ET Inv., the "ET Debtors").

Rules 1007 and 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and this Court's Local Bankruptcy Rule 1007-1.

## The Chapter 11 Cases

3.      On the date the above cases commenced (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Concurrently herewith, the Debtors are filing a motion seeking to consolidate their chapter 11 cases for procedural purposes only. The Debtors are operating their businesses and managing their properties and assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has been appointed in these chapter 11 cases.

## The Debtors and Their Business Operations

A. NEG

4.      NEG is primarily a holding company, which owns and manages, directly or indirectly, more than 190 subsidiaries (the "Subsidiaries," and collectively with NEG, the "Company").  The Company is an integrated energy company with a strategic focus on power generation and natural gas transmission in North America.

5.      NEG was incorporated on December 18, 1998, as a wholly owned subsidiary of PG&E Corporation ("PG&E Corp."), which is not a Debtor.[2]  In January 2001, PG&E National Energy Group, LLC ("NEG LLC") was interposed between PG&E Corp. and NEG.[3]   NEG's principal Subsidiaries include:   (a) PG&E Generating

---

[2]      Pacific Gas and Electric Company ("PG&E Co."), an affiliated entity of the Debtors, currently is a chapter 11 debtor in a chapter 11 case pending in the Northern District of California, San Francisco Division (the "California Bankruptcy Court").

[3]      Accordingly, PG&E Corporation owns 100% of NEG LLC, which, until recently, owned 100% of NEG.  Within the past few months, certain entities exercised options, resulting in NEG LLC

Company, LLC and its subsidiaries (collectively, "Gen LLC"); (b) PG&E Energy Trading Holdings Corporation and its subsidiaries (collectively, "ET"); and (c) PG&E Gas Transmission Corporation and its subsidiaries (collectively, "GTC"), which includes PG&E Gas Transmission, Northwest Corporation and its subsidiaries including North Baja Pipeline, LLC ("NBP") (collectively, "GTN").[4]  NEG also has other less significant subsidiaries.

6.      The Company has two reportable business segments:  interstate pipeline operations ("Pipeline"), which comprises GTC (including GTN), and integrated energy and marketing activities ("Energy"), which comprises Gen LLC and ET.  In the Pipeline business, the Company owns, operates and develops natural gas pipeline facilities, including the GTN pipeline and North Baja pipeline.

7.      In the Energy business segment, the Company engages in the generation, transport, marketing and trading of electricity, various types of fuel (e.g. coal and natural gas) and other energy-related commodities throughout North America.  As of December 31, 2002, the Company had ownership or leasehold interests in 27 operating generating facilities with a net generating capacity of 7,469 megawatts (MW).   In addition, the Company had four facilities totaling 4,463 MW under construction.[5]  In the first quarter of 2003, the Company drastically reduced its marketing and trading operations.

---

owning 97% of NEG, and various entities, primarily General Electric and Lehman Brothers, owning the other 3% of NEG.

[4]      A schematic of the entities comprising the Company is annexed to the Affidavit of John C. Barpoulis in support of First-Day Motions.

[5]      The Company has agreed in principle to transfer these four facilities, in addition to two others in operation, to the secured lenders providing construction financing for these facilities.

<u>NEG's Prepetition Debt</u>

8.        NEG's debt as of December 31, 2002, included: (a) approximately $704 million outstanding on a revolving credit facility provided by JP Morgan Chase, as agent (the "Corporate Revolver"); (b) $1.069 billion outstanding in respect of 10.375% senior subordinated notes due 2011 (the "Senior Notes"); and (c) various guarantees of debt and equity obligations owed by certain of NEG's Subsidiaries, with maximum exposure of approximately $1.165 billion[6] (collectively, the "Guaranty Obligations"). NEG has no secured indebtedness.[7]

B. <u>The ET Debtors</u>

9.        The ET Debtors consist of four entities that are part of the Energy business that markets and trades electricity, various fuels and other energy-related commodities.    Historically, the ET Debtors have engaged in energy trading for two reasons.    First, the ET Debtors purchased energy commodities from, and sold energy commodities to, their non-ET affiliates in furtherance of the Company's overall enterprise.    By way of example, the ET Debtors might purchase coal or natural gas needed in the production of electricity by one of the Company's electric plants, and sell the electricity produced by that plant to third parties.    Secondly, the ET Debtors had engaged in a proprietary trading business, which essentially sought to earn revenue by

---

[6]        As of May 31, 2003, the debt and equity guaranty amount was approximately $1.169 billion, and the aggregate amount of NEG's guaranty obligations, including the debt and equity guaranty amount and guarantees relating to ET's tolling agreements of approximately $600 million, was approximately $2.9 billion.

[7]        While none of the obligations described in (a) through (c) above is secured, the primary obligations of GenHoldings, La Paloma and Lake Road, each a non-debtor Subsidiary, that underlie the Guaranty Obligations are secured  by power plants and certain other assets owned by them.  Similarly, the Turbine Revolver (defined below) is secured by a Subsidiary's interest in certain equipment.

purchasing and selling energy commodities independently of any physical assets that the Company may have owned or operated.  In this business activity, the ET Debtors would buy and sell electricity, coal, gas and other commodities with the expectation that many of these transactions would never go to physical delivery but would instead financially settle.

10.     The ET Debtors' energy marketing and trading team has been responsible not just for managing the supply of fuel for, and the sale of electric output from, the Company's owned and controlled generating facilities and other trading positions.  Additional functions have included evaluating and implementing structured transactions, including management of third party energy assets, tolling arrangements, management of the requirements of aggregated customer load through full requirement contracts, restructured independent power producer contracts and the purchase and sale of fuel transportation (e.g. gas pipeline transportation).

11.     As part of its overall restructuring efforts, the Company is in the process of winding down its energy trading and marketing operations.  With respect to its proprietary trading business, the Company will no longer be engaged in that business in any form.  In addition, services provided by the ET Debtors in support of the Company's physical assets -- primarily its generating facilities -- have been moved from the ET Debtors' operations to other parts of the Company.  In some cases, these affiliate support services have been contracted for from independent third parties.

12.     Accordingly, going forward, the functions of the ET Debtors will be limited to winding down their businesses and providing litigation support in respect of

claims resulting from the termination of certain trading contracts and other agreements associated with the wind down of its operations.

<u>Events Leading Up to the Debtor's Chapter 11 Filing</u>

13.    As of December 31, 2002, the Company had total assets of approximately $7.9 billion and total liabilities of approximately $8.9 billion (book value). For the year ending December 31, 2002, the Company sustained a net loss of $3.4 billion.[8]

14.    On November 14, 2002, NEG defaulted on the repayment of the $431 million 364-day tranche of the Corporate Revolver.  This default also constitutes a cross-default under (a) the $273 million 2-year tranche of the Corporate Revolver, (b) the Senior Notes, (c) NEG's guarantee of an approximately $205 million revolving equipment loan facility provided by Societe Generale, as Agent, to PG&E National Energy Group Construction Company, LLC, a Subsidiary (the "Turbine Revolver"); and (d) its equity commitment guarantees for the (i) Gen Holdings Credit Facility ($355 million outstanding), (ii) La Paloma credit facility ($375 million outstanding) and (iii) Lake Road credit facility ($230 million outstanding).  In addition, on November 15, 2002, NEG failed to pay a $52 million interest payment due under the Senior Notes.

15.    Before July 31, 2002, all of the rated debt instruments of NEG and its affiliates carried investment-grade credit ratings as assigned by Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's").  On July 31, 2002 and August 5, 2002, S&P and Moody's, respectively, downgraded NEG's credit ratings.  On October 8,

---

[8]    As of March 31, 2003, the Company had total assets of approximately $7.6 billion and total liabilities of $8.98 billion in liabilities (book value).  For the quarter ending March 31, 2003, the Company sustained a net loss of $.4 billion.

2002, October 16, 2002, October 18, 2002 and November 13, 2002, Moody's further downgraded the senior unsecured debt rating issuer rating and syndicated bank credit facilities of NEG. On October 11, 2002 and November 14, 2002, S&P further downgraded certain of NEG's debt facilities. Moody's and S&P also downgraded the credit rating of certain of NEG's Subsidiaries. The result of these downgrades has left all of NEG rated entities and debt instruments at below investment-grade.

16. The downgrade of NEG's credit ratings impacted various guarantees and financial arrangements that require NEG to maintain certain credit ratings. As a result of the ratings downgrades, NEG's counterparties have demanded or may demand that NEG provide additional security for performance in the form of cash, letters of credit, acceptable replacement guarantees or advanced funding of obligations.

17. Similarly, the downgrade had an immediate adverse affect on the ET Debtors. As a direct consequence of the downgrade, many contract counterparties demanded cash collateral to secure the ET Debtors' contingent obligations thereunder. Meanwhile, the downgrade also limited the ET Debtors access to the cash necessary to meet those collateral calls. Moreover, the widespread and well-publicized collapse of the energy trading industry has eliminated any real hope that the ET Debtors' trading operations will become profitable in the foreseeable future.

18. During the months prior to the Petition Date, NEG explored various options to restructure its indebtedness and guarantee obligations. These options, included, without limitation, sales of assets and businesses, discussions with the various creditors regarding debt restructuring, and the reorganization of existing operations. The implementation of most of these options would have been subject to obtaining necessary

third party approvals and would have required compliance with NEG's other agreements and applicable laws and regulations. NEG, therefore, has been in active negotiations regarding global restructuring of its debt with the lenders under the Corporate Revolver (the "Prepetition Lenders"), the GenHoldings credit facility, the La Paloma and Lake Road credit facilities and the Turbine Revolver as well as representatives of the holders of the Senior Notes (the "Prepetition Bondholder Committee").

19. These efforts by NEG to reduce debt or raise cash (e.g., through asset sales) have failed to produce adequate sources of liquidity for NEG to meet its obligations. NEG currently has no access to the capital markets and lacks adequate liquid funds to fulfill its commitments as they mature. As of the Petition Date, NEG and certain subsidiaries were in default on all or substantially all of their outstanding indebtedness and had no further availability under any of its credit facilities. Nonetheless, through, among other things, the disposition and liquidation of selected assets and termination of certain unprofitable businesses, the Company may be restructured around its profitable pipeline business and its independent power producer assets. In order to achieve its restructuring goals while preserving value in the Company, the Debtors determined that restructuring NEG's obligations and liquidating the ET Debtors could best be achieved through a chapter 11 filing.

20. The Debtors' efforts, however, have succeeded in moving towards a resolution of issues among the Debtors and their various creditors. The Debtors believe they have an agreement in principle with their major creditors respecting their restructuring (including the liquidation of the ET Debtors). The Debtors have developed a proposed plan of reorganization (the "Plan"), which is being filed with the Court

contemporaneously herewith, which seeks to implement such agreement.  The Debtors intend to seek to obtain approval of the Plan expeditiously.

**Relief Requested**

    (i)    <u>Consolidated List of Creditors</u>

    21.    Bankruptcy Rule 1007 requires that the Debtors file with this Court a list containing each of the Debtors' creditors.  FED. R. BANKR. P. 1007.

    22.    First, although NEG, one of the Debtors, does have the ability to file a list of its creditors, the ET Debtors operate on an interrelated basis such that it is more accurate to identify their creditors on a consolidated basis at this time.[9]  Filing with this Court a single creditor list for the ET Debtors on a consolidated basis would serve the fundamental purposes of submission of such lists without imposing undue burdens or delays on the Debtors.  The waiver of the requirement that the ET Debtors file a separate list of creditors for each ET Debtor would save significant time and thousands of dollars of unnecessary cost and expense.

    (ii)    <u>Consolidated List of Thirty (30) Largest Creditors</u>

    23.    Similarly, because the ET Debtors have operated on an interrelated basis, the Debtors submit that a consolidated list of the ET Debtors' 30 largest unsecured creditors would provide notice to the ET Debtors' largest creditors in an efficient and economical manner.    24.    Because NEG maintains a separate listing of its creditors, NEG will file a separate list of its 30 largest creditors.

---

[9]    The Debtors are preparing their schedules presently and may be able to separate out information on the ET Debtors to a greater degree by the time the schedules are filed.

25.    The waiver of the specific requirements of Fed. R. Bankr. P. 1007(d) and Local Bankruptcy Rule 1007-1 for entity-by-entity lists of the 20 largest unsecured creditors will save the Debtors significant time and thousands of dollars of unnecessary cost and expense, and will provide sufficient notice to the Debtors' largest creditors in an efficient and economical manner.

## Conclusion

**WHEREFORE**, the Debtors respectfully request entry of an Order of this Court (i) authorizing the Debtors to: (a) file a consolidated list of the ET Debtors' creditors and a separate list of NEG's creditors; and (b) file a consolidated list of the ET Debtors' 30 largest unsecured creditors, in lieu of individual lists of each Debtors' 20 largest unsecured creditors, and a separate list of 30 largest creditors for NEG, and (ii) granting the Debtors such other and further relief as this Court deems just and proper.

WILLKIE FARR & GALLAGHER
Matthew A. Feldman
Shelley C. Chapman
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

and

WHITEFORD, TAYLOR & PRESTON
L.L.P.
/s/  Martin T. Fletcher
Paul M. Nussbaum, Bar No. 04394
Martin T. Fletcher, Bar No. 07608
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland 21202
(410) 347-8700

Co-Counsel for the Debtors and
Debtors in Possession

-12-

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the Petition Date, a copy of the foregoing pleading was sent by the means indicated and to the parties identified on the Omnibus Certificate of Service filed concurrently with this pleading. In order to expedite the copying and transmittal of pleadings to parties in interest, a copy of the Omnibus Certificate of Service was not transmitted with the pleading. Any party desiring a copy of the Omnibus Certificate of Service may contact the undersigned or may review the original at the Clerk's Office.

/s/ Martin T. Fletcher
Martin T. Fletcher

*1499511v5*

-13-