Date signed August 28, 2006



_____
PAUL MANNES
U. S. BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
## at Greenbelt

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| NATIONAL ENERGY & GAS | : | Case No. 03-30459PM and |
|   TRANSMISSION, INC. | : | 03-30461 through 03-30464 and |
|   (f/k/a PG&E NATIONAL ENERGY | : | 03-30686 through 03-30687 (PM) |
|   GROUP, INC.), et al. | : | Chapter 11 |
| | : | |
| | : | Jointly Administered under |
|                     Debtors | : | Case No. 03-30459PM |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |

## MEMORANDUM OF DECISION
### (Objection to Claims Filed by Lehman Brothers, Inc.)

Before the court are cross-motions for summary judgment on Debtors' Amended Objection to Claims Nos. 14 and 699 filed by Lehman Brothers, Inc. ("Lehman"). The matter came before the court for argument on August 16, 2006. The parties agree that the material facts are not in dispute. The motions deal with the interpretation of a Letter Agreement between Lehman and PG&E National Energy Group, Inc., now National Energy & Gas Transmission, Inc. ("NEG") dated November 25, 2002 ("the Agreement"), pursuant to which Lehman was engaged to perform advisory services, including valuation analyses, and to help sell certain assets.

The proofs of claim filed by Lehman are for amounts allegedly due under the "tail" to the Agreement. The critical language of the Agreement is found at page 2:

> Should the Company [NEG] elect to terminate this Agreement pursuant to paragraph 11 below, Lehman Brothers will promptly provide the Company with a list of entities contacted with respect to any transaction contemplated by this

>Agreement (the "List").  Should the Company, subsequent to the termination of this Agreement and within 12 months of such termination, announce a transaction with any party on the List, then the Company will pay Lehman Brothers a fee in accordance with this paragraph 2, as  appropriate.
>
>Lehman Brothers acknowledges that should the Company become subject to a bankruptcy proceeding, this Agreement will need to be approved by the Bankruptcy Court in order for it to continue to be in force and effect.  NEG agrees to use reasonable best efforts to seek such approval from the Bankruptcy Court.

What is curious about the second quoted paragraph is that, prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, that prospectively removed the bar to employment, under § 101(14)(C), an investment banker such as Lehman could not be considered a disinterested person under the Bankruptcy Code and be eligible for employment by the Debtors-in-Possession or Trustee by virtue of § 327(a) of the Code.  The Bankruptcy Court does not have the discretion to ignore this statutory mandate.  A valid professional appointment likewise is required as a prerequisite to an award of compensation under § 330(a) of the Bankruptcy Code.  A leading case espousing these black letter rules is that of *In re Federated Dep't Stores*, 44 F.3d 1310 (CA6 1995), a case in which the financial advisor involved was Lehman.

      NEG argues that this contract is subject to rescission as one made under a mutual mistake, and in support of this proposition, it relies upon *Gould v. Board of Ed. of the Sewanhaka Cent. High School Dist.*, 616 N.E. 2d 142, 146-147 (NY 1993) .  The court in *Gould* opined that "[t]he mutual mistake must exist at the time that the contract was entered into and must be substantial.  The idea is that the agreement as expressed, in some material respect does not represent the 'meeting of the minds' of the parties." *Id*. at 146.  But that case has no application here and the court cannot find that the contract is subject to rescission in part because of a mutual mistake of law.   It was only after Lehman substantially performed its work that NEG looked elsewhere and hired another investment banker.  As the record is presented, there was an anticipatory breach of contract by NEG.

      The court will next deal with the failure of Lehman to furnish a list of entities contacted.  For reasons described in the uncontradicted Declaration of Thomas H. King, formerly the President of the West Region of PG&E National Energy Group, Inc., now NEG (the "King Declaration"), the court finds that NEG had actual knowledge of the five bids received as a result

of Lehman's efforts and that the ultimate purchaser, TransCanada Corp., was among the high bidders. Fundamental fairness is satisfied by actual notice that substantially complies with the contractual notice provision. *Boston Celtics Ltd. P'ship v. Shaw*, 908 F.2d 1041, 1046 (CA1 1990). The court finds further that the failure to deliver a list of the persons contacted did not amount to a forfeiture of Lehman's rights to compensation as the delivery of the list was not a condition precedent. The purpose of the delivery of the list was to protect Lehman. The language of the Agreement is not in the clear, unmistakable terms required to establish a condition precedent under New York law, which law governs the outcome of this case. *See generally Oppenheimer and Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 NY 2d 685, 691 (1995).

Following the execution of the Agreement, Lehman provided extensive services and, again as set forth in the uncontradicted King Declaration, provided strategic advice as to the best means of selling the assets placed in its hands. Lehman analyzed the companies that were potential bidders, brought them into the bidding process, regularly providing "NEG personnel with written reports and lists detailing the potential bidders it had contacted (including TransCanada), which bidders were interested in participating in the auction, and which bidders had executed confidentiality agreements and where bidders were in the due diligence process." King Declaration, ¶9.

Notwithstanding the results of Lehman's efforts, NEG determined that it was not feasible to sell PG&E Gas Transmission Corporation Northwest ("GTN") at that time. The reason that behind this decision was, as described by Mr. King, that "GTN had issued several guarantees to counterparties of NEG's energy trading business. . . . However, due to NEG's precarious financial condition, it was unable to restructure its financing to unencumber GTN. As a result of this and other factors, GTN could not be sold at that time." King Declaration, ¶12. Under the Agreement, NEG agreed that Lehman would receive compensation for its work on the GTN sale process if NEG terminated the engagement with Lehman and then announced the sale of GTN within 12 months of the termination to a purchaser which had initially been brought to NEG's attention by Lehman. This appears to be precisely what happened.

On July 8, 2003, NEG and its affiliates filed petitions under Chapter 11 of the Bankruptcy Code. On that same date, the Debtors filed 31 motions, including a motion filed pursuant to § 365(a) for an order rejecting certain letter agreements between the Debtors and Lehman and Goldman Sachs & Co. (Docket Entry #33) , as well as a motion for an order authorizing the

employment of Lazard Freres & Co. as financial advisor and investment banker (Docket Entry #40) . The rejection motion stated that "[a]lthough the Lehman Agreement can be terminated by either party on ten days' notice, the Lehman Agreement contains a twelve month 'tail' period, indemnification provisions and other obligations that may survive termination." The reason given for the rejection in paragraph 21 of the motion is that "in the light of the Company's current restructuring plan, the services that Lehman was to provide under the Lehman Agreement are no longer necessary." Having hired Lazard Freres to do the work, the agreement with Lehman was a redundancy. While court approval would have been required to continue the Agreement in full force and effect, NEG shortcut that procedure by its motion to reject. This court signed an Order granting the motion that was entered on August 7, 2003. The Order provided that any proof of claim for damages arising from the rejection of the agreements must be filed on or before 30 days after the entry of the Order and was entered without prejudice to the rights of any party in interest to object to any claims asserted respecting the agreements. Both orders were entered *nunc pro tunc* to the petition date.

  On September 3, 2003, Lehman filed a proof of claim based upon services performed and for damages arising out of rejection of the Agreement. The claim, at that time, was both contingent and unliquidated. On February 24, 2004, a news release was issued by NEG and TransCanada announcing that NEG and TransCanada entered into an agreement for TransCanada to acquire the subject assets for $1.703 billion. Lehman thereupon filed an Amended Proof of Claim with compensation based upon Appendix A to the Agreement, using the sales figures set out in the news release as the basis for its liquidated damages claim in the amount of $7,217,000.00.

  NEG raises various defenses to Lehman's proof of claim as amended. First it argues that, because the Agreement to perform services after filing of the bankruptcy case could never be approved by this court, the tail provision does not apply. While the employment of Lehman as an investment banker was barred, that fact prevented only allowance of any administrative expenses to Lehman pursuant to 11 U.S.C. § 503(b). However, this dispute is not over the allowance of an administrative claim wherein the court must first approve the appointment of Lehman pursuant to 11 U.S.C. § 330(a)(1), but over the allowance of an unsecured claim without priority under 11 U.S.C. § 502(b). The issue for decision is whether Lehman belongs in the pool of creditors paid pro rata for services rendered prior to the filing of the bankruptcy case. The effect of rejection of

an executory contract under 11 U.S.C. § 365(g) is that of a breach of the contract and a claim arising from that breach is allowed or disallowed as if the claim had arisen immediately before the date of the filing of the petition. Richard I. Aaron, *Bankruptcy Law Fundamentals* §9.11 (2006). The fact that the Agreement was no longer in effect is of no significance to the allowance of the contingent claim originally filed by Lehman. The claim was contingent, because no money was due Lehman unless within twelve months of termination, an applicable transaction was announced.

      NEG next urges that the tail provision never became operative because Lehman failed to show that NEG elected to terminate the agreement, a condition precedent to its efficacy. The court finds this argument of NEG a remarkable exercise in casuistry – the contract was ended, but not terminated? In support of this argument, NEG relies upon the case of *In re Alongi*, 272 BR 148 (B.C. MD 2001). *Alongi* involved a personal services contract that a Chapter 7 debtor sought to reject because it contained a covenant not to compete that she deemed onerous. It is true that Judge Derby's opinion states that "[r]ejection of an executory contract, because it constitutes a breach, does not terminate the contract"; however, he goes on to say that the rights and obligations of the parties remain intact because rejection does not change the substantive rights of the parties. *Id*. at 153. He concludes that, while the contract was rejected, the covenant lived on. While personal service contracts may not be assumed by the trustee under 11 U.S.C. § 365(c)(1), the party rejecting the agreement remains burdened with the contract obligations. The court finds no support for NEG's argument in *Alongi*, a case where the individual Chapter 7 debtor, not the trustee, sought to reject a personal services contract.

      Accordingly, the court finds that NEG has not established a valid defense to Lehman's proof of claim as amended and that Lehman is therefore entitled to summary judgment thereon. An appropriate order will be entered.

cc:
Thomas J. Whiteford, Esq., Whiteford Taylor & Preston LLP, 210 W. Pennsylvania Ave.,
    Ste. 400, Towson, MD 21204
John F. Carlton, Esq. and Dennis J. Shaffer, Esq., Whiteford Taylor & Preston LLP, 7 St.
    Paul Street, Ste. 1400, Baltimore, MD 21202
Marcell Solomon, Esq., Marcell Solomon & Assocs., P.C., 7500 Greenway Center Drive,
    Ste. 1130, Greenbelt, MD 20770
Henry Condell, Esq., Phillips Nizer LLP, 666 Fifth Ave., New York, NY 10103-0084
John L. Daugherty, Esq., Ass't United States Trustee, 6305 Ivy Lane, Ste. 600, Greenbelt,
    MD 20770

**End of Memorandum**